THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT PUHL, Defendant-Appellant.

First District (5th Division) No. 1—89—1411

Opinion filed March 15, 1991.

458

460

Anthony Pinelli, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Veryl L. Gambino, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Defendant, Robert Puhl (Puhl), was indicted on 12 counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(b)(1)) and two counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1987, ch. 38, par. 12—16(b)(1)). The indictment charged that defendant had committed the sexual acts against two young girls, B.L. and N.D. The girls were under the age of 13 at the time. Puhl pled not guilty to the charged acts, and a bench trial was held. Puhl was found guilty on all counts except count II and count VIII and sentenced to 10 years in the Illinois Department of Corrections. Puhl appeals from the judgment of conviction.

Puhl seeks reversal of his convictions based on alleged errors of the trial court. On appeal Puhl raises the following issues: (1) whether the trial court erred in finding the complaining witnesses competent to testify; (2) whether the State failed to prove the defendant guilty beyond a reasonable doubt; (3) whether the trial court's questioning of a complaining witness denied defendant a fair trial; (4) whether the trial court improperly admitted the opinion of an expert witness and the complaining witnesses' out-of-court statements to the expert; and (5) whether the defendant was denied a fair trial as the result of testimony of proof of other crimes and bad acts.

We summarize, below, the relevant testimony presented at trial.

Mrs. Rasmussen, the mother of B.L., was the State's first witness. She testified that in the fall of 1983, B.L. began biting her nails and "tuning out." In the spring of 1985, B.L. complained of headaches and stomach aches. These complaints occurred two to three times per week, always shortly after B.L. went to bed. Mrs. Rasmussen also noticed B.L. posing in a provocative fashion in the mirror.

Mrs. Rasmussen and her husband had not discussed sex with B.L. nor did B.L. have sex education in school. However, Mrs. Rasmussen did notice two incidents of B.L. exhibiting unusual behavior of a sexual nature. On one occasion Mrs. Rasmussen found B.L. lying in bed without a pajama top and asked her what she was doing. B.L. told her that she was waiting for her husband. On a separate occasion Mrs. Rasmussen was driving B.L. and N.D. to a lesson. The girls were lying down in the back of the car giggling. When asked about what the girls were doing, B.L. told her mother they were playing "a game of boyfriend, girlfriend." B.L. explained that when they played the game, they lie down and hold each other and kiss and hug. Lying down was an essential part of the game.

On one occasion in the summer of 1985, Mrs. Rasmussen noticed that B.L.'s vagina looked different and that she found a spot of blood on her daughter's underpants. Mrs. Rasmussen questioned B.L. as to whether or not anyone was touching her or doing anything to her, and B.L. said no.

By the fall of 1985, in addition to the complaints at bedtime, nailbiting and "tuning out," B.L. on occasion did not want to go to school. In January 1986, the Rasmussens sought treatment for B.L. at the Institute for Motivational Development. After psychological testing, B.L. began to see Dr. Mary Halpin.

During the period of 1983 to 1986, Mrs. Rasmussen never saw Puhl at her house.

B.L. was the State's next witness. The trial court conducted a competency examination of the witness, who, at the time of trial, was 11 years old. The trial court found the witness to be competent.

B.L. testified that in August of 1983, she lived in Palatine, Illinois, and was friends with N.D. She was also friends with Jo Ann Puhl, the defendant's sister. Approximately one week after B.L. moved, she saw Puhl near her house and he asked her to come with him and told her she would get candy and money. Puhl took her into the woods behind Lincoln School and took off his clothes and told her to take off her clothes.

B.L. remained in the woods with Puhl, and he gave her some candy. Puhl told B.L. that if anyone found out, he would get into trouble, so she told no one about the incident.

Approximately one week later, Puhl returned. At the time B.L. was home playing with N.D. Puhl approached and told B.L. to come with him and he would give her candy. B.L. told N.D. to come with and the two girls accompanied Puhl to the woods.

B.L. testified that between 1983 and 1986, Puhl took her and N.D. to the woods, his bedroom at home, or into his truck, once a week. She alleged that Puhl took pictures of her and N.D. in his bedroom posing like older women, while undressed. On some occasions, Jo Ann was present in her brother's bedroom during these sessions. B.L. testified that she had never seen any pets while in the Puhl home.

B.L. stated that the last time she was with Puhl was on a date in July of 1986. She could not remember the exact date; however, she knew it was before her birthday on July 16. B.L. claimed that she, Puhl and N.D. went to the woods. In the woods Puhl and both girls took off their clothes. After they were all undressed defendant started to lie on top of B.L., rubbing and touching her near her vagina with his hands. Puhl then kissed B.L. on her face, near her vagina and on other parts of her body. Puhl then "tried to stick his private part up" her, but was only able to get it in her "a little bit." B.L. testified that when she said "private part" she meant penis. B.L. said, "[h]e took it out because it wouldn't fit into me and then he wanted [N.D.] He wanted to lie on top of [N.D.] and do the same things to her." B.L. saw Puhl lie on top of N.D. and try "to stick his penis up her." Then defendant wanted B.L. and N.D. "to rub him on his private part and then he—and then this white sticking stuff came out." The girls were then allowed to get dressed and go home.

B.L. said that she never tried to run away from Puhl. She also stated that on those occasions when she was in Puhl's room and Jo

Ann was present, Jo Ann took her clothes off. B.L. could not estimate how many times Puhl had come by her house, but she knew it was always on weekdays and always in the afternoon.

B.L. testified that, sometimes, when she and N.D. saw the defendant coming toward B.L.'s house they would hide from him. Additionally, when they were in the woods with defendant they did scream, but defendant told them that if they did not stop screaming he would hit them. B.L. testified that on one occasion, Puhl had slapped her. She told defense counsel that this was in July of 1986. She was sure that this happened the week before the 4th of July of 1986.

B.L. began to see Dr. Mary Halpin. Dr. Halpin gave her a book about good touching and bad touching. B.L. said that she did not know that she could say no to an adult. B.L. testified that she did not tell Dr. Halpin what defendant had done to her just to make Dr. Halpin happy nor did Dr. Halpin tell her to say that defendant was doing things to her or that it was defendant who was touching her. B.L. testified that although defendant had only slapped her once, she had overheard him telling N.D. that he would come to her at night and kill her family and her parents and she believed that he would do the same thing to her. B.L. saw Dr. Halpin the night before she testified, and the doctor pretended that they were in court and asked her questions. N.D. was present during these sessions.

B.L. testified that everything she said in court was the truth and that no one told her what to say in court.

N.D. was the State's third witness. The trial court conducted a competency examination of N.D. and determined N.D. competent to testify. N.D. testified that she was a friend of B.L.'s and that they had met in first grade. N.D. was also friends with Jo Ann Puhl.

N.D. said that she was once at B.L.'s house when Puhl showed candy to her and B.L. The two girls went with Puhl into the woods. Puhl also took the two girls into a pick-up truck and his bedroom. N.D. testified that Puhl took pictures of her and B.L. She also stated that, on some occasions, Jo Ann Puhl was also present in the bedroom and participated in the activities.

N.D. remembered that the last time she saw Puhl was close to B.L.'s birthday, July 16, but N.D. could not remember what year. N.D. did know that this was more than a year before B.L. moved away. (B.L. moved in September 1987.) N.D. said that on the last time Puhl took her and B.L. to the woods, Puhl took off his clothes and told the girls to take off their clothes. Puhl told the girls to lie on the ground. First, Puhl "laid on top of [B.L.]" and then he lay on top of

N.D. When he was on top of her he also "rubbed her." When asked where Puhl rubbed her, N.D. responded, "Just all over my body." Then Puhl "tried to put his private part" in her. Puhl then told B.L. and her "to rub his private part up and down." N.D. said that when Puhl lay on top of her he kissed her on her face and private parts. Puhl threatened N.D. by telling her that if she told her parents and her parents told the police he would kill her and her parents by stabbing or strangling them.

N.D. did not recall whether or not she talked with Dr. Halpin before or after the alleged incident with Puhl which she had described in her testimony. When asked if Dr. Halpin ever told her what to say in court, N.D. answered, "No. I knew it because I saw it with my own eyes and I tell it from the truth because I swore to tell the truth and it's the truth because I saw with my own eyes. Even my friend [B.L.] did."

Dr. Halpin, a psychologist, also testified on behalf of the State. Dr. Halpin had been consulted by B.L. in January of 1986. B.L.'s parents sought counseling for her because of her underachievement in school. Dr. Halpin conducted a clinical interview during which she asked B.L. questions about family, friends, and school. As a result of her testing and the clinical interviews, Dr. Halpin recommended that B.L. begin counseling. Dr. Halpin testified as to various tests she had administered to B.L. Dr. Halpin interrogated B.L. regarding Jo Ann's brother. On June 25, 1986, B.L. told the doctor that Jo Ann's brother took her into the woods and touched her thigh sometime in 1984. On June 30, 1986, B.L. told the doctor that the incident had only happened one time, two years prior. The doctor stated that on July 21, 1986, B.L. told her that before she began second grade, Jo Ann's brother took her into the woods and fondled her.

The defense called Dr. Naham Greenberg, a psychologist. Dr. Greenberg is a psychologist who specializes in child psychology and sex offenders. Dr. Greenberg testified that in his opinion Dr. Halpin had incorrectly focused her interviews on her own assumption that B.L. had been molested. Dr. Greenberg described the techniques used by Dr. Halpin as "highly suggestive." Dr. Greenberg told the court that he characterized Dr. Halpin's technique as investigatory and designed to achieve a specific result.

Robert Puhl testified on his own behalf. He stated that he was 25 years old and married with a child. Since 1982 he had been employed as a carpenter by a firm called International Decorator. His normal work hours were 7 a.m. until 3:30 p.m. In 1986, from June 21 to July 5, Puhl went to Hawaii with his Marine Corps Reserve Unit.

Puhl denied that he ever took N.D. or B.L. into his bedroom, truck, or into the woods. Puhl knew of N.D. through his sister Jo Ann but he did not know B.L. or where she lived. He testified that he had never undressed in the company of those two girls and he had never touched or molested them.

The parties stipulated to the following facts: on the date of Puhl's arrest, his home was searched and no camera, photo album, or photos of nude women and young children were found; specifically, no photographs of B.L. or N.D., or any tarp for Puhl's truck were found; and from June 21, 1986, to July 5, 1986, defendant was in Hawaii on active duty with the Marine Corps Reserve.

Puhl's mother testified for the defense. She testified that she had two dogs, Doberman Pinschers, and about their habits. She knew N.D. and had seen her in her house, but did not remember B.L. ever being in her home.

Jo Ann Puhl testified on behalf of her brother. She testified that she and N.D. were best friends, like sisters, and that she knew B.L., but not well. Jo Ann denied that her brother ever touched her or told her to take her clothes off. Jo Ann testified she had written notes about important events on September 7, 1986, after her brother was arrested. She had written down everything that she felt was important. The notes said that two years earlier N.D. told Jo Ann that N.D.'s dad touched N.D. in her private spot. She did not tell anyone about it. Jo Ann agreed that the only writing she crossed out was about Erin, another of her friends, and that everything else in the notes was "right." However, in subsequent questioning regarding the notes, the State asked Jo Ann if she wrote "Robby yelled at [N.D.] and [B.L.] because either they were in the garage with me or they were by his truck, he did not hit them." Jo Ann then testified that it was wrong. She then stated, "because I remember, like I should have erased it, because [B.L.] wasn't there, not everybody is perfect."

For the following reasons, we affirm in part and reverse and remand in part.

The trial court determined that the two girls were competent to testify. Puhl argues that the trial court's examination of the two girls was woefully inadequate and the trial court's ruling that N.D. and B.L. were competent to testify was an abuse of the court's discretion.

In *People v. Ballinger* (1967), 36 Ill. 2d 620, 225 N.E.2d 10, a competency examination of a nine-year-old boy revealed the following: the boy gave his name but did not know how to spell his last name; he

knew the name of his school but was unable to give its location; he lived with his grandmother but he did not know her address; and he testified that he knew what it meant to tell the truth and said that on certain occasions he had told a lie to his grandmother but he told the court that he would tell the truth and would not tell any lies. The trial court found the boy competent to testify, and the Illinois Supreme Court affirmed the decision. *Ballinger* (1967), 36 Ill. 2d at 622.

There is no rigid formula for establishing the competency of a witness to testify. It is the degree of a child's intelligence, rather than chronological age, that determines a minor is competent to testify. (*People v. Garcia* (1983), 97 Ill. 2d 58, 454 N.E.2d 274, *cert. denied* (1984), 467 U.S. 1260, 82 L. Ed. 2d 856, 104 S. Ct. 3555.) In determining the competency of a witness to testify, a trial court is to consider four criteria: (1) the ability of the witness to receive correct impressions from her senses; (2) the ability to recollect these impressions; (3) the ability to understand questions and express answers; and (4) the ability to appreciate the moral duty to tell the truth. *People v. Diaz* (1990), 201 Ill. App. 3d 830, 835, 558 N.E.2d 1363; *People v. Seel* (1979), 68 Ill. App. 3d 996, 1004, 386 N.E.2d 370, 376.

Applying the aforecited factors to the instant case, we believe the trial judge properly found both victims competent to testify. In this case the subsequent testimony of N.D. and B.L. tended to confirm that both girls were competent to testify. "Once the judge determines that a minor is competent to testify, any confusion or contradiction in later testimony only goes to the minor's credibility and does not affect his competency to testify." (*People v. Diaz* (1990), 201 Ill. App. 3d 830, 835, 558 N.E.2d 1363; *In re Cruz* (1979), 76 Ill. App. 3d 565, 395 N.E.2d 388.) Furthermore, "[u]nless testimony at trial establishes that the witness did not meet the criteria for competency, that testimony cannot establish that a determination of competency constituted an abuse of discretion." *People v. Diaz* (1990), 201 Ill. App. 3d at 835-36, 558 N.E.2d 1363.

The standard of review on the issue of the competency of a witness is whether the trial judge abused his discretion in permitting the witness to testify (*People v. Brown* (1972), 52 Ill. 2d 94, 105, 285 N.E.2d 1) or there was a manifest misapprehension of some legal principle. *People v. Ballinger* (1967), 36 Ill. 2d 620, 622, 225 N.E.2d 10.

Based on the above standard, we must affirm the trial judge's conclusion that the two victims were competent to testify. Responding to the trial judge's questions, B.L. and N.D. each testified as to her name, address, age, school and family. Each girl told the judge that

she understood the difference between the truth and a lie and promised to tell the truth. The trial judge took into consideration the factors required to determine the competency of a witness. It is clear that both B.L. and N.D. were able to perceive events, to remember those events, to communicate, and to appreciate the duty to tell the truth. Puhl's charge that the trial judge abused his discretion in finding the two girls competent to testify is not supported by the facts or the law.

Puhl argues that he was not proven guilty of the sex offenses beyond a reasonable doubt. Counts III and IV allege penetration in that defendant placed his fingers in the vagina of B.L. Counts IX and X allege penetration in that defendant placed his fingers in the vagina of N.D. We must reverse Puhl's conviction as to the aforementioned counts.

■■ ■ An appellate court must view the evidence in a light most favorable to the prosecution, and after viewing the evidence in such a light, if proof of the essential element of a crime supports a conviction, an appellate court must affirm. (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453.) However, the record is devoid of any testimony that Puhl placed a finger in the vagina of either girl. Consequently, even viewing the evidence in a light most favorable to the prosecution, we cannot find that Puhl was proven guilty beyond a reasonable doubt of counts III, IV, IX and X.

Accordingly, we reverse the judgment of conviction as to counts III, IV, IX and X. In light of this conclusion, we remand the cause to the trial court solely for the purpose of a resentencing hearing.

■■ Relying on *People v. Findlay* (1988), 177 Ill. App. 3d 903, 532 N.E.2d 1035, Puhl argues that where the defendant is charged with aggravated criminal sexual abuse and denies the charge, a conviction can stand only when it is based on clear and convincing testimony or substantial corroboration for the charge. However, we note that this court recently stated, in *People v. Westfield* (1990), 207 Ill. App. 3d 772:

> "[T]here is no additional requirement that in a case in which a sex offense is charged the State must, in addition to proving the defendant guilty beyond a reasonable doubt, demonstrate either the evidence is substantially corroborated or the victim's testimony is clear and convincing. The testimony of no other category of crime victim is held to be automatically suspect or to require additional proof beyond the statutory requirements."
> (*People v. Westfield* (1990), 207 Ill. App. 3d 772, 777, quoting

*People v. Roy* (1990), 201 Ill. App. 3d 166, 185, 558 N.E.2d 1208.)

We find that defendant's conviction here may stand under either standard.

■ Clear and convincing testimony is not synonymous with uncontradicted or unimpeached testimony. (*People v. Creger* (1988), 172 Ill. App. 3d 807, 526 N.E.2d 1376.) A complainant's testimony is deemed clear and convincing if her story is consistent and discrepancies do not detract from its reasonableness. (*People v. Escobedo* (1986), 151 Ill. App. 3d 69, 502 N.E.2d 1263.) "Minor contradictions or inconsistencies that occur go to the weight of the testimony and, therefore, are to be evaluated by the trier of fact." *People v. Barlow* (1989), 188 Ill. App. 3d 393, 412, 549 N.E.2d 947.

■■ ■ The credibility of the complainant is an issue best determined by the trier of fact, who heard the testimony and observed the demeanor of the witnesses. A trier of fact's determination as to the credibility of a witness is to be accorded great weight, and its finding of guilt will not be disturbed absent a showing that the evidence is so unsatisfactory as to warrant a reasonable doubt of guilt. (*People v. Tannahill* (1987), 152 Ill. App. 3d 882, 504 N.E.2d 1283.) A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or credibility of the witnesses. It is not the function of a court of review to retry the defendant. (*People v. Phillips* (1989), 127 Ill. 2d 499, 509, 538 N.E.2d 500.) These settled rules require us to affirm the trial court's conclusion as to Puhl's guilt.

■ Corroborating evidentiary matters include an eyewitness account, confession or admission by the defendant, prompt reporting of the incident by the victim or medical testimony which supports allegations of abuse. (*People v. Server* (1986), 148 Ill. App. 3d 888, 894, 499 N.E.2d 1019, 1024, *cert. denied* (1987), 484 U.S. 842, 98 L. Ed. 2d 88, 108 S. Ct. 131.) The record discloses that the two complainants corroborated each other's testimony, each testifying as an eyewitness to acts perpetrated upon the other girl. We find that Puhl's conviction is not based on evidence which is improbable or unsatisfactory and that no reasonable doubt of defendant's guilt exists. Puhl sets forth the testimony of N.D. and B.L. in great detail in his brief. We have set forth many of these details in reciting the facts of the case. Reviewing the record, we find the respective testimony of each girl to be articulate and clear and convincing. Any discrepancies were minor in view of the overall clarity. To conclude that Puhl was not proven guilty beyond a reasonable doubt, this court would have to determine

that both complainants were liars or could not tell the truth and the trial judge was either incompetent or could not tell the difference between the truth and a lie. The record supports neither conclusion.

■■■ In determining whether the evidence was sufficient to support defendant's conviction, we are guided by the general rule that a reviewing court will not reverse a conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of guilt. (*People v. Young* (1989), 128 Ill. 2d 1, 51, 538 N.E.2d 453.) This reasonable doubt test should be applied in reviewing the sufficiency of evidence in all criminal cases. (*People v. Pintos* (1989), 133 Ill. 2d 286, 291, 549 N.E.2d 344.) Based on the testimony and the applicable standard of review, we must reject Puhl's argument that he was not proven guilty beyond a reasonable doubt and affirm his conviction as to counts I, V, VI, VII, XI, XII, XIII, and XIV.

The third issue Puhl raises is that he was denied a fair trial because the trial judge conducted a leading examination of N.D. The testimony at issue is as follows:

"MS. WINNINGER: So you were in third grade in 1986?

A. I don't remember the year.

THE COURT: Were you going into the third grade or you just got out of the third grade? Was school over with or was it still going on? Do you remember?

THE WITNESS: Well, I know school was over with because of the date because school gets out in June.

THE COURT: So school was over. And you were going into the third grade or going into the fourth grade; do you remember that?

THE WITNESS: No.

THE COURT: No. Okay."

Shortly afterward, the prosecutor asked a series of questions relating to the acts charged in the indictment. Midway through that examination, the witness ceased answering questions and the following occurred:

"Q. Now, which private parts are you talking about? Can you point to where they are?

A. (No audible response).

Q. Can you point on Miss Crowley where he touched?

A. (No audible response).

Q. You don't know or you just don't want to?

A. I don't want to. I'm nervous.

Q. Why don't you rest for a minute?

THE COURT: [N.D.], how you doing? You okay?

THE WITNESS: No.

THE COURT: I know it's hard. [N.D.] why don't you—if you're able to, when you're able to, and take all the time you need, just tell me in your own words what happened when you were in the woods. [N.D.], do you want to go into my office?

THE WITNESS: No.

THE COURT: Would that be better for you?

THE WITNESS: No, it's okay.

THE COURT: Okay. You're very brave, [N.D.]. Just take all the time you need.

MS. WINNINGER: [N.D.], can you just tell the judge what happened that day? Do you want to just look right at him and tell him what happened? You don't have to look at any of us.

A. That's okay.

THE COURT: You feeling a little bit better.

THE WITNESS: A little.

THE COURT: Okay. Do you want some water?

THE WITNESS: No, thank you.

THE COURT: Okay?

THE WITNESS: Yeah.

THE COURT: All right, honey. When you went into the woods with Robby, tell me what happened.

THE WITNESS: Well, he told [B.L.] and I to take our clothes off.

THE COURT: Okay. And then what?

THE WITNESS: And then he took his clothes off.

THE COURT: Okay. And then what?

THE WITNESS: And then he told us to lay on the ground.

THE COURT: Okay. And then what did he do after that?

THE WITNESS: He laid on top of me.

THE COURT: And when he laid on top of you, what did he do? Did he do anything?

THE WITNESS: He kissed me.

THE COURT: Did he do anything else?

THE WITNESS: He rubbed me.

THE COURT: Did he do anything else?

THE WITNESS: I can't remember.

THE COURT: Okay. Honey, where did he rub you? What part of your body? Could you tell me?"

██ █ Puhl is correct, a trial judge in a criminal case should be a neutral observer. Yet, at the same time a judge is not condemned to silence.

> "[A] trial judge has a duty to see that justice is done, and if it appears that justice will fail because a fact has not been developed or a line of inquiry had not been pursued, the judge has a duty to intervene either by suggestions to counsel or by his own inquiry or examination of witnesses, if necessary, and, so long as he does not forget his role as judge in doing so, his actions are proper." (*People v. Hicks* (1989), 183 Ill. App. 3d 636, 646, 539 N.E.2d 756, 762.)

As long as the trier of fact does not abandon his judicial robe and adopt the role of prosecutor and his questions are designed to achieve justice, the trial judge's questioning does not constitute reversible error. *People v. Hicks* (1989), 183 Ill. App. 3d 636, 646, 539 N.E.2d 756, 762.

 This was by no means an easy case for the prosecution, defense or judge. Puhl was charged with 12 counts of aggravated sexual assault and two counts of aggravated sexual abuse. The assault charges ranged from penetration of the vagina by penis, fingers, threats to kill, and contact between penis and mouth. The abuse counts included fondling of the chest, buttocks, and vagina. The defendant was found guilty of 12 of the 14 charged counts. We find that in the present case the trial judge did not improperly act as a prosecutor when he asked questions of N.D. In questioning the nervous young complainant, the trial judge was merely trying to get a clarification of the witness' version of the event. In light of the numerous specific sexual acts defendant was charged with, questions posed of the young complainant to clarify what happened were not only proper but necessary. We believe the judge properly fulfilled his duty to see that justice was done.

The fourth issue Puhl raises concerns the testimony of an expert psychologist. Puhl claims that Dr. Mary Halpin's opinions and testimony by her as to certain out-of-court statements made by the complaining witnesses should not have been admitted. Puhl argues that the trial court seized upon this improper evidence to provide corroboration for the complainants' testimony and that it was a significant factor in the trial court's determination of guilt. Puhl asserts that this evidence deprived him of a fair trial and its admission and consideration are a basis upon which a new trial should be granted. We do not agree with Puhl's argument and find that the expert testimony was properly admitted evidence.

Specifically, the complained-of evidence concerns the psychologist's testimony of her opinions after interviews with B.L. and N.D. Puhl interprets the opinions by Dr. Halpin to state that B.L. had been sexually molested. In fact Dr. Halpin's opinion was that B.L. was "very frightened." She merely testified that with respect to any sexual molestation that "the testimony showed me she [B.L.] had a fear of men and my conclusion was that it was worthwhile to investigate with her in psychotherapy whether or not she had ever been sexually molested." There was nothing in the testimony of the expert that the expert was of the opinion that B.L. was in fact sexually molested.

■■ The issue of whether or not a witness is an expert is within the trial court's discretion. (*People v. Bradley* (1988), 172 Ill. App. 3d 545, 526 N.E.2d 916.) The qualification of a witness as an expert will not be disturbed without a showing of an abuse of discretion on the part of the trial court. (*Bradley*, 172 Ill. App. 3d at 550, 526 N.E.2d at 920.) The trial court's qualification of Dr. Halpin as an expert witness came after extensive questioning by both the State and defense counsel. Defendant did not object to the trial court's qualification of Dr. Halpin as an expert witness.

Puhl argues that Dr. Halpin testified to numerous conversations in "which defendant was named or acts allegedly perpetrated by him were described." However, in response to defendant's objections to such testimony, the trial judge stated:

"I will allow it in for purposes, not for the purpose of relating the testimony of Dr. Halpin as to there is an attack, it's contemplated there is an attack as to Dr. Halpin's opinion in this case, and it results to that I will allow it in, but not for the purpose of establishing a particular crime as to these other acts as it relates to the defendant. So for those—for the limited purpose as indicated by the court I will overrule the objection."

Several minutes later defense counsel renewed its objection. The trial court responded, "I will overrule your objection for the same reasons, and further I want to state that the only—I will only consider evidence as to the crime alleged in the indictment or information."

■■ ■ A trial judge, due to his particular training and experience, is regarded as having a greater ability than a jury to restrict the use of improper evidence. (*People v. McNeal* (1977), 56 Ill. App. 3d 132, 138, 371 N.E.2d 926.) In a bench trial as opposed to a jury trial, there is a presumption that the trial judge considered only competent evidence, and that presumption will be overturned only where this is an affirmative showing that the trial judge considered incompetent evidence. (*People v. Gholston* (1984), 124 Ill. App. 3d 873, 886-87,

464 N.E.2d 1179, 1189.) Nothing in the record supports a finding that the trial judge considered the evidence for an improper purpose. The trial judge's statements indicate that he allowed Dr. Halpin to testify as to the details of the conversations for the limited purpose of determining whether her methods in eliciting those conversations were suggestive or unprofessional.

The modern standard for the admissibility of expert testimony is whether the testimony will aid a trier of fact's understanding. The facts disclose that B.L. was brought by her parents to the psychologist because of her underachievement in school, not because of any alleged sexual molestation by Puhl or anyone else. The expert's opinions were of assistance to the fact finder if for no other reason than to explain the failure of the two young complainants to complain about the molestation for a period of two years and the absence of physical evidence concerning the molestation. Puhl also complains that it was error for the trial court to permit the expert to testify concerning Puhl's sexual acts with them. Such out-of-court statements by a victim to an expert are as a general rule inadmissible hearsay. However, here the trial judge expressly allowed the testimony for the limited purpose of weighing the psychologist's opinion and not for the purpose of establishing a crime.

Puhl claims Dr. Halpin's hearsay testimony provided the only conceivable corroboration upon which the court could have found the defendant guilty. Nothing in the record indicates that the trial judge considered the evidence for the purpose of determining Puhl's guilt. The testimony of each of the girls concerning Puhl's acts on the other girl provided sufficient corroboration for a determination of guilt; thus, we cannot find that Dr. Halpin's testimony provided the only corroboration upon which a finding of guilt could be based.

The defendant was charged with committing certain specific acts during two weeks in July of 1986. At trial, the State introduced testimony regarding the first time B.L. met Puhl in 1983. Defense counsel objected to the testimony. The State in turn asserted that it was merely "setting a stage," rather than "going into a specific act."

The State continued to "set the stage" by way of testimony that Puhl came back the next week and again took B.L. into the woods, and on later occasions, took both B.L. and N.D. B.L. testified that this occurred once a week for three years, except that in the wintertime, they would go into Puhl's house and his bedroom. B.L. stated that in the bedroom, Puhl took pictures of the girls posing naked. N.D. also testified to the picture taking and posing.

Puhl argues that the above evidence is not even remotely related to the crimes for which he was on trial and was improperly admitted. Puhl asserts that evidence regarding picture taking and posing could have no purpose other than to prove an alleged propensity by the defendant to commit the crimes charged in the indictment. As a result, Puhl claims such evidence introduced for that improper purpose denied defendant a fair trial, serving no purpose in this case except to prejudice the defendant and show that he had a propensity to commit crimes.

Alternatively, the State maintains that the trial court properly allowed the victims' testimony as a well-established exception in cases involving sexual offense to children. Further, the State maintains that the victims' testimony did not prejudice defendant and defendant was not denied a fair trial.

■■■ There is a well-established exception to the rule that evidence of other crimes is generally inadmissible. When prosecuting a sex-related offense upon a child, evidence of prior sexual acts between the defendant and the victim is admissible to show the familiar relationship between the parties and to corroborate the victim's testimony as to the act relied upon for conviction. *People v. Esterline* (1987), 159 Ill. App. 3d 164, 168, 512 N.E.2d 358, 361.

In *People v. Cleveland* (1980), 83 Ill. App. 3d 675, 404 N.E.2d 876, defendant was charged with a sexual offense against a child. At defendant's trial the victim testified about a series of sexual contacts with the defendant for 10 months preceding the date of the charged offense. The defendant argued that he was prejudiced by that evidence. This court held that the trial court's ruling was consistent with the established rule of law that evidence of more than one act of taking indecent liberties with the same child is not admissible for the purpose of proving distinct offenses but is admissible for the purpose of showing a relationship and familiarity of the parties. *Cleveland*, 83 Ill. App. 3d at 682, 404 N.E.2d at 881.

■■■ In the present case the trial judge allowed the testimony at issue into evidence only to "set a stage" or show a relationship and familiarity of the parties. Nothing in the record or the trial court's finding indicates that the trial judge found the defendant guilty on the basis of the prior acts.

Finally, we note that counsel for defendant uses the victims' names in his brief. There has been considerable protest in the bar in Illinois about the use of a victim's name in briefs on appeal. In an appeal in criminal sex cases, the use of the name of a victim has little, if anything, to do with either the facts of a case or the law, and merely

tends to continue the hurt of an innocent victim. We urge counsel and other members of the criminal defense bar to cease the use of the names of the victims in such cases.

For the reasons set forth above, we affirm the judgment of conviction as to counts I, V, VI, VII, XI, XII, XIII and XIV; we reverse the judgment of conviction as to counts III, IV, XI and X, and we remand the matter to the trial court for a resentencing hearing in light of our reversal of the aforementioned four counts.

Affirmed in part; reversed and remanded in part.

GORDON and McNULTY, JJ., concur.